Good morning, your honors, and may it please the court. Paul Clement for the appellates. I would like to endeavor to save five minutes for rebuttal. Just watch the clock, counsel. I will. This case involves a challenge to the county's policy of interpreting good cause to require an applicant to demonstrate that they have a particularly acute need for self-defense which distinguishes them from their fellow citizens. My client's complaint is not with any state statute. The statute can be interpreted to respect Second Amendment rights. Indeed, it is interpreted in just that way by many counties within California. So the concern then, the source of the constitutional difficulty, is appellee's policy. And this court, of course, could strike down that policy without in any way calling into question the broader statutory scheme. Indeed, to the contrary, by striking down San Diego's interpretation of good cause, this court would actually be saving the statute from constitutional difficulty or grave constitutional doubt. Now, the question in this case I think properly understood is not whether there is a constitutional right to concealed carry. The question instead I would submit is whether there is a constitutional right to have some outlet to the right of the Second Amendment to carry an arm for purposes of self-defense. And I think that's an important distinction. The answer, of course, to that question is provided by Heller itself, which is, yes, you cannot have a law that is just antithetical to one of the core exercises of the Second Amendment right. And, you know, in that sense, I think the Heller decision really goes a long way to deciding this case. Now, appellee's principal response to that, of course, is to suggest that Heller somehow recognizes a homebound right, a right that doesn't extend outside home and hearth. And with all due respect, I don't think that position can be reconciled with the Heller decision itself. Well, Mr. Clement, the Supreme Court's had two opportunities to address the scope of an individual's right under the Second Amendment and has narrowly limited those holdings. And obviously, from your aware of can you count to five, that it sounds like, you know, they didn't have five votes to go outside the home. However, they indicated some language that might mean that you could. So why should this circuit, as an intermediate court, be the first to expand those holdings to find the Second Amendment encompasses a right to armed self-defense in public? Well, Your Honor, a couple of points. One is this Court wouldn't be the first circuit to extend the right outside the home. The Seventh Circuit in the Ezel case, for example, recognized that the right is not limited to the home. But I would take issue with your reading of the or implicit reading, if you will, of the Heller case in particular. Because I think it's just a misreading of the decision to say there were five, there weren't five votes to do anything outside of the home. If you look at the opinion structurally, the opinion begins by analyzing the scope of the constitutional right. And in that context, when it's talking about the constitutional right itself, the Court is quite clearly, I think, not limiting it to the home. And I think the best evidence of that is when it separately analyzes, you know, first it analyzes keep, then it analyzes bear. Now, when it analyzes bear, the first thing it does is equate bear to carry, carry specifically for purposes of self-defense. Then I think even more tellingly for the proper resolution of this case, the majority then adopts Justice Ginsburg's statement about what bear means for the Muscarello case. And that statement, which I think is very informative, is to bear, wear, carry upon the person or in clothing or in pocket for purposes of being armed and ready for defensive or offensive purposes. So that's what the Supreme Court says about the right to bear arms. Now, it would be very odd. I mean, I would imagine if all the Second Amendment said was there was a right to keep arms, maybe that would be limited to the home somehow. But the right to bear arms, which the majority, without limiting it in any way to the home, equates to carry, almost naturally extends outside the home. But it goes further than that, okay? In the passage that I think the appellee's probably their favorite passage in the Heller opinion is the one where the Court suggests. Now, there's certain things that aren't we don't cast any doubt on certain regulations. One of the regulations on which they say they aren't casting doubt on is carrying arms in sensitive places like schools and government buildings. Now, if the right was limited to the home, if that was the only thing they had five votes for, that line would be a complete non sequitur. There'd be no need to talk about limiting laws that limit the right to carry in sensitive places because by force of the assumption that it didn't extend outside the home, there'd be no right to carry anywhere outside the home, which clearly is not what they said. I'd love to go on, though, because the Court, when it's talking, again, in the part of the opinion where they are Roman I, where they're talking about the scope of the constitutional right, they also analogize it to and give essentially life to the right by looking at state court decisions that are dealing with efforts to limit the right to carry outside the home. And in every one of those cases, the courts, you know, these are state Supreme Court decisions, but they're in the immediate sort of post-framing era. Every one of those, if a state tried to ban open and concealed carry simultaneously, those were struck down. So all of that analysis about the scope of the constitutional right is in no way limited to the home. Where the in the home language comes from is Roman IV of the opinion, and that's simply when they're applying the constitutional analysis they've already done to the D.C. ordinance. And it would be pretty bad, if I may say so, judicial craftsmanship if they didn't limit some of their statements in Roman IV to the home because that's where the D.C. ordinance applied. Well, if you're – if we were to accept your argument, do you envision – obviously in the Ninth Circuit we have nine different states, and they're very different states. For example, California is very different than Arizona and Alaska. And would you envision states having – in the sense of the government having very different interests? For example, California maybe having higher crime, being more populated, that they would be able to have different – they could justify different burdens on the right than, say, Alaska, which is more rural and they have bears running around, and people have to shoot bears in order to get to work. So – Judge Callahan, I would be surprised if after a decision in our favor in this case, if the gun regimes in every state in the Ninth Circuit looked exactly the same. What I would say is the kind of irreducible consequence of Heller and then McDonald is there's going to be some floor, you know, some basic constitutional guarantee that no state within the Ninth Circuit or any other part of the union can sort of go beyond. And in some ways, I think this case presents this Court with an opportunity to do exactly what the Supreme Court did in Heller, which is – if this Court wants to, obviously it can say something about the standard of review, and I'd be happy to talk about this. But I think this is one of the rare cases like Heller itself where the Court can invalidate the county's policy without definitively setting a standard of review, because this policy is very much like the policy in Heller, because it eliminates any outlet for the ability to carry a firearm for purposes of self-defense. And in that way, it's just antithetical to the Second Amendment. And I would point you – you know, I actually think Heller goes a long way to deciding this case, because in Roman IV of Heller, where it's talking about the limitations, you know, now it's talking about in the home, it's talking about the D.C. law, one of the things it says about the D.C. law is it says that this law has almost – is so antithetical to the Second Amendment right that it has almost no analogs in earlier American history. But it doesn't say there are none. And one of the ones – in fact, the very first one it points to is the Georgia law that was partially invalidated in State Against None. And what Georgia did is it purported to prohibit simultaneously open carry and concealed carry. And the Georgia court there struck down the restriction – in that case, it struck down the restriction essentially on open carry and allowed open carry. But the – my point is the Supreme Court specifically said that there are very few analogs to this kind of complete prohibition on the exercise of the right. And when there were those in earlier days, they were struck down. And so in the same way, I think this Court can look and they can say, we're taking a look at the California statutes. All we need to look at, though, is the county's policy, because that's all my clients have challenged. And if you look at the California statutes, they now, with the passage of Act 144, basically disallow open carry. So the way to make that statutory scheme consistent with the Constitution, the key to it, is what does good cause mean? If good cause means, as it does in many counties in California, that if you go in and, you know, there's a possibility to conceal carry under the statute, then it's consistent with the Constitution. I don't think – we're not here to say that there's a right to concealed carry if there's open carry, or if there's a right to open carry if there's concealed. But you can't simply shut down every avenue to the exercise of the Constitution. Kagan. You would concede, arguably, concealed carry is different than open carry in the sense that, with the government's interest in terms of whether you know someone's carrying or whether you can't tell for – There are definitely differences in those policies. I think the key thing is you can't do both simultaneously. You know, there are early cases that have this – and, you know, and it may be that states within the Ninth Circuit would have a different view on this. But there are open cases that, you know – early cases, rather, that basically say, you know, roughly speaking, they weren't particularly gender neutral at that point. You know, a gentleman carries his arms openly. It's un-gentlemanly to conceal carry. On the other hand, other states make a different judgment. Those, I think, are probably open. But what you can't do is say, well, we don't like open carry. We don't like concealed carry. Because what that means, almost by definition, is there's no way to exercise one of the absolute core aspects of the right, which is the right to bear arms, carry arms, for purposes of self-defense. Counsel, you mentioned that different counties may come up with different solutions. Fill us in on Sacramento County. My understanding is that there's another case that's going to be argued next week called M.E.H.L., M-E-H-L. And Sacramento County originally held or had in its ordinance a good cause requirement. But do I understand correctly that they have now changed that, and that self-defense is now allowed as a substitute for good cause? That's my understanding, Your Honor. And I'm not sure it's even a substitute for good cause. I think they've essentially adopted the sheriff has adopted a policy that says that wanting the firearm for purposes of self-defense is good cause. And here, San Diego, I mean, you know, and that's why I think it's critical to understand this isn't a challenge to the statute. Because as the Sacramento sheriff's actions and other sheriff's actions demonstrate, you know, there's nothing about good cause that says that you have to show a heightened need for self-defense. It is perfectly consistent with the statute to say that good cause is a need for self-defense. If somebody comes in and says, you know, I want this firearm not for purposes of self-defense, but because I want to engage in a business opportunity that's not protected, I want to be a bodyguard or something, the county can still say, no, thank you, that's not something that the statute allows. But if somebody comes in and says, I want this to, you know, for purposes of self-defense, what we don't think the county can say is effectively, well, wait a second, you have to show me why your need for self-defense is particularly acute. Because the Supreme Court, after all, said all of us have to be able to do that. Well, your clients would get a permit in Sacramento now, the way that it is. That's my understanding, yes. That's my understanding. And with respect to that, one of your clients, I understand, is the California Rifle and Pistol Association, is that correct? That's right. And they are parties to this litigation in the Mell case, which will be heard next week? I think they filed an amicus brief in that case. I don't know that they're actually technically a party to that. All right. But in any event, do you have a position with respect to now that Sacramento has changed its policy and allows self-defense as a basis for the permit, does that moot that other litigation? I'm not sure that it does. You know, as I said, I think there are also some standing issues in that piece of litigation as well. And I don't know. There may be other claims in that case. Because, again, we're an amicus in that case, but we're not a party to that case. I would say one thing. You know, that is a case where the State was, you know, made a party to that case. And the State actually resisted and suggested that, you know, this is really a decision for the individual sheriffs. But the State ultimately, you know, provided a brief in that case. And, you know, if that brief would be helpful, that is something that we could lodge with this Court. I think the question is that case may have priority under our system. So we may have to wait for the outcome of that case if it bears on this one. But that's something that we'll have to resolve internally. Let me ask you this question. If we get beyond the threshold issues in this case, what analytical construct would you apply with the Second Amendment in these kinds of cases, both in terms of scrutiny and in terms of whether we ought to support First Amendment analysis or substantial burden analysis, et cetera? Sure. Well, Your Honor, you know, I guess I would say three things, kind of my order of preference. One is, I really do think this is a relatively rare case where you don't even have to get to those issues, and you could just essentially do a Heller and say this is antithetical to the right, so we don't have to reach it. Now, if you went beyond that, I think, you know, our preferred position would be for you to apply strict scrutiny. But I'm also cognizant of the fact that a couple of members of this panel have written on this topic and have suggested that maybe a substantial burden test would be the right way to proceed. And I guess I'd then like to focus on what a substantial burden test would look like, because I do think if the Court were to adopt a substantial burden test, then this case would give the Court an opportunity to essentially fill in the second half of the analysis, because I think this is clearly a case, unlike a regulation on a gun show, which has an attenuated effect on your ability to exercise the direct right in the Second Amendment, this would be a core interference with the right, so it would be a substantial burden. And then the question is, what comes next? And I would say that only two things really make sense. One is, either that's it, it's unconstitutional, and, you know, that's the way I think it works in the abortion context, which is you recognize something has a substantial burden on the constitutional right, then that's the end of the analysis, it's just And I think that follows pretty directly from the Peruta panel opinion, which I – rather, the Nordyke panel opinion, which I recognize is vacated. But the Nordyke panel opinion, as I understand it, adopts the substantial burden test in part because it recognizes that applying intermediate scrutiny in every case would be problematic and that a substantial burden test would be essentially more administrable for the judiciary. And it would seem to me very counterintuitive to have a substantial burden analysis to avoid the sort of imponderables of applying intermediate scrutiny, and then when you have a substantial burden, you kind of go back to intermediate scrutiny. So I gather you're saying that if your preferred position is strict scrutiny, if we get beyond that, are you supporting a substantial burden test or just recognizing the votes on the panel? It's more of the latter, but I guess I would then say, you know, perhaps we I'm interested in your view on it. I mean, do you think that's the right test? I think strict scrutiny is the right, you know, the right way. I think, you know, the NRA amicus brief sort of lays out the argument. I mean, I don't think there are other contexts where the Court recognizes a fundamental right and then doesn't apply strict scrutiny. I know there's debate about that, but we do think that's the better view. But I would also say that at a minimum, you know, if there's a basis for compromising, the basis for compromise would be if there's a substantial burden, then obviously there has to be at least strict scrutiny at that point. It can't be that you then bounce back to intermediate scrutiny. If I could, I'd reserve the balance. Certainly may do so, counsel. Thank you. We'll hear from the other side. Good morning. James Chapin on behalf of the appellee William Gore. May it please the Court. Let me start off with responding to the Court's inquiry about the attorney general. I did contact the attorney general at the outset of this litigation and have been in contact with them throughout. They have been of some assistance, but have declined to formally participate. I don't know if that really answers the Court's question, but I think it may be At least they're on notice. That's the main thing. They're on notice. And I'm not sure that if their participation is required, it looks like it's voluntary by rule. It appears so. But I think They'd rather have us decide it. I think that Article III, as opposed to elected officials. But I think that To make sure that our eyes are dotted and teeths crossed, do we need to get something formal from the AG saying that they declined to participate? I don't Because what we'd hate to have happen at some subsequent point in this litigation is a suggestion that we didn't follow the regulations and the statute and the civil rules. Believe me, I looked at that at the beginning because I thought it might be an indispensable party issue, and I couldn't find anything. And in conferring with them, they didn't think it was Well, I take it you don't object if we were to contact them, but you've given us a report on what the likely response is going to be. And it may be that the reason they didn't participate may be because this was not a challenge directly to the statute. It's a challenge to the Sheriff's administration of the licensing program, which makes this case unique, and I think it's unusual and may be fatal to the appellant's position because they don't challenge the statute. They don't challenge the regulatory scheme. And, you know, the Sheriff doesn't ban anything. The Sheriff doesn't burden anybody. The Sheriff doesn't exercise prior restraint. The Sheriff administers a licensing program which actually offers, using their words, an alternative means of exercising the right. And some courts have actually said that. That's one of the alternative means. But they have to be able to specify their threats or something along those lines. They just can't say I want to defend myself and my family, right? Yes. That's not enough. Their position is they can write in the good cause section, I have a Second Amendment right to bear arms, and I don't have to say anything else. Well, is this case – if these cases squarely raise the issue of whether a citizen has a right to bear arms outside of the home, are we required to rule on the scope of an individual's right under the Second Amendment in order to decide that? And if so, what right, if any, do you contend a citizen has to carry a weapon in public? That's a long question. I'm not sure that this is the right case. And if I was the Supreme Court, I'm not sure this is the case I would want to take, at least the Peruta case. Maybe the Hawaii case would be more suitable. But because it's challenging the administration of a licensing program and not the statute itself. Now, if we want to talk about Second Amendment issues, and I think we have to, and the District Court did, there's – I can't tell you – Well, it is sort of the elephant in the room. I can't tell you where the Supreme Court's going to go on that. And I think that the real issue is once you set foot outside the home, the governmental interest becomes significantly stronger. There's a lot of things we don't regulate in the home. You can get drunk in your home. You can't be drunk in public. You know, many things like that. But in the context of – Well, would you concede that the interpretation that – you know, obviously in looking at Heller and looking at McDonald, is there anything in Heller that forbids their interpretation of the Second Amendment? Forbids it? I would say no. And that's why a lot of courts have said we can't tell, and so we go through the interest analysis in order to cover both ends of it. And that may be what this Court decides to do. Well, obviously, you know, obviously as an intermediate court, you know, I would say that a reasonable approach would be that we interpret Supreme Court precedent as they meant it. And so if you're saying there's nothing that forbids their interpretation and there's nothing that compels your interpretation, why are we not free to interpret it in the first instance? You know, one thing I would agree with counsel on is that I would prefer these things didn't percolate up through the courts forever. We would all like to have these issues resolved. We're trial lawyers. But we're percolating right now, are we not? We're percolating. And I'm not getting anywhere. But I think those decisions need to be made. I can't say that Heller forbids it. But I do think Heller does go a long way towards deciding this case because Heller carves out concealed carry as one of those regulatory measures that are appropriate in view of an individual right to bear arms. And that's because, it seems to me, there's a presumption that the governmental interest is so strong when you have a deadly weapon involved. But the problem, it seems to me, that you need to address is the limitations in the concealed carry. And unlike Sacramento County, which has specifically provided that self-defense may be considered good cause for the issues of a permit, County of San Diego does not have a similar provision. We do not have an absolute. The sheriff exercises discretion. And that's one of the interesting things about California, is that we allow the sheriff, who is an elected constitutional officer, to make a decision on behalf of his or her community. Well, the term in your ordinance is good cause, is it not? Well, that's the statute. The statute's term is good cause. Well, how about the county ordinance? It's not a county ordinance. It's a sheriff's policy. There's no ordinance involved. It's a state statute that has a good cause. All right. So it's the sheriff interpreting the state statute. Yes. With respect to San Diego County. Other counties have their own local rules, of course. And every sheriff interprets it differently. And in rural counties, I'm sure they interpret it more differently than San Diego, Los Angeles, San Francisco, where they're more conservative. But interestingly in San Diego, we're very actually liberal about granting the permits. We do not just deny them. Our policy is to grant them based upon a showing. Well, but a sheriff, depending on how we define the scope of the Second Amendment right, a sheriff can't violate the Second Amendment. True.  And we know that, you know, in some places we do have states that have open carry laws. And that's okay. Because that's permitted if they want to do that. But here in California, you can't open carry and you can't concealed carry. And so you have to go to your sheriff to have any exception from that. So if the core right is to self-defense, if in fact that's what the Second Amendment says and it doesn't confine it to the home, then your policy, your sheriff's policy would be in violation, would it not? If that's how we define the core right. The state law would be in violation, not the sheriff's administration of the program. I think that's a problem here. And I think it's an interesting notion and a leap of logic to say that because California now has an open carry ban, that somehow the concealed carry regulation is automatically unconstitutional without ever being challenged. But then the state doesn't want to. But then both sides are telling us we don't need the state here. So if we were, it seems to me, if we were to say, and I'm not talking hypothetically here, I'm just, if we were to say that the core right were self-defense, then you're saying the sheriff's not a problem and the state would be a problem, then we would have to have the state here, wouldn't we? Well, I think there might be another challenge that would be necessary and there are open carry challenges out there. But to say that the concealed carry regulation is automatically unconstitutional is a horrible leap of logic to me. And I don't think the Supreme Court's going to jump in on that when the state law hasn't been challenged. That would be my interpretation. You're obviously closer to them than I am. But, and I think really the question ultimately that needs to be answered to me and for all of us is once you set foot outside the home, isn't there an automatic governmental interest in regulating a deadly weapon? Because we don't need, I'm sorry. The second, I'm continuing on your line of thought, which is if we expand Heller beyond the home, then what analysis do you think we ought to apply? Well, I don't, that's what I want to find out because I don't think we need to have empirical studies to tell us that a firearm is a deadly weapon. We don't need to have historical analysis that adds nothing to that. I'm asking do you think we should use a substantial burden analysis? Do you think we should use strict scrutiny? Do you think we should use intermediate scrutiny? Do you think we should use time, place, manner restrictions? What's your position? I thought the substantial burden analysis was a good one and the Second Circuit has adopted that as of last week. They probably read your opinion and liked it. That's Judge O'Scanlon's opinion. I was a nerd about that. Your opinion. I was a nerd about that one, but that was a long time ago. But they seem to like it and it seems to work and I think the intermediate scrutiny standard is worthy and I accepted that from my district judge. Okay, so if you accept that, how do you apply it to this case? Well, as the district judge did, that there's a substantial governmental interest because of the deadly nature of a firearm and I don't think you need to go much further than that. You don't need empirical studies to show that. You don't need historical analysis to show that. And we have to look at the practicalities of what we're living in in our society and what type of society we want to live in. And the Second Circuit talks about local regulation. You mentioned other states have other laws. And imagine if you found a constitutional right to bear arms outside the home and loaded and there's a sudden spike in handgun violence in the city of San Francisco the next year and their city council is helpless to do anything about that. It just doesn't seem to me to make policy sense to have that kind of national law that forbids local regulation. And I think the Second Circuit talks about that in deference to the legislature and to local jurisdictions based upon their individual needs. And that's what the Sheriff of San Diego County is looking at. He's an elected official. He's accountable to the public. Every sheriff is in the state of California. And they can act on behalf of their sheriff. Well, the Constitution's the bigger picture than, you know, there were people that were discriminating all around the country until the courts told them that the Constitution didn't allow them to do it. And so it, I mean, it is, you know, it isn't, you know, depending on how we interpret the Constitution, it isn't necessarily up to everyone how they want to handle things. Well, the nature of the instrument is what makes this so different. There are other arms that you can bear that don't involve this type of deadly nature. I mean, a handgun with a couple clips is a weapon of mass destruction. So that's what's so unique. But Heller said you could, you know, in your home a gun is still a deadly weapon. Sure. So, and I mean, you know, there are scenes out there like you don't take a knife to a gunfight. So if the, you know, if we're talking, it really just goes back to how you define that core right. Yes, it does. And Heller didn't completely answer that question for us. Which is why we're here. Now, so to the extent that the right has been defined, perhaps as Mr. Clement suggests it is, self-defense. Would a typical San Diego citizen coming in to apply for a permit and say, I apply for this permit exercising my Second Amendment rights for self-defense. Would that be a sufficient showing, assuming that the person qualifies on all other means, not a felon, no history of mental problems, perhaps is qualified with target range practice and all that sort of thing. Would the assertion, just like the Sacramento amended rule in Sacramento, would the sheriff, you mentioned discretion, but would the sheriff be more inclined to grant the permit under those circumstances or not? Only if there was a demonstrable and documentable particularized need. That's the sheriff's policy. It's just not that I have a right to self-defense under the Constitution. And so I want to carry a loaded firearm around the public streets in a concealed fashion. But isn't the requirement of a demonstrable need a burden on the Second Amendment right? No. The statute burdens the Second Amendment rights. The sheriff offers a license to those who can exercise an alternate means of exercising the right. So the sheriff doesn't burden the right at all. The sheriff offers a license. It's the statute, the prohibitory statute, that burdens the right. So is that statute unconstitutional? Not the concealed statute. And I'm not here to talk about that. That's 12031? Pardon me? 12031. 12031. Is that unconstitutional under Heller? Well, 12031 has been amended now. Unfortunately, the briefs are all inaccurate because the whole statutory scheme has changed. The numbers have all changed. The essence of it is still there except that now there is an open carry ban for unloaded open carry as well as the prior ban, 12031. And neither side wants to remand to the district court for reassessment in light of the amended statute. Well. Or is that your position? The statute. The whole part of the constitutional analysis has completely changed with the amendment. Well, not with respect to this case because this case, as far as I'm concerned, is limited to concealed carry. And I don't believe that a concealed carry regulation is unconstitutional because California has enacted an open carry ban. But if you credit your opponent's argument, the opponent's argument says, well, now there's no outlet. Well. For exercise of Second Amendment rights. I would ask the court. I mean, it does affect the constitution or could affect the constitutional analysis. I understand their position. They don't want to remand. And I gather you don't think remand is necessary for reconsideration in light of that argument. I don't. And I think that perhaps the Hawaii case will resolve some of those issues. And if you look at the Second Circuit opinion in Kachowski, it's the same situation as we have now in California. They have an open carry ban and a concealed carry ban. And they have a long history of that. And that was upheld in Kachowski. Let me ask you this. If we get to the substantial burden analysis, I gather from your remarks, and you can correct me if I'm wrong, that you think an empirical approach in each case should be considered by the courts in determining whether a substantial burden has been imposed. Do I interpret you correctly? I had a cough. I didn't hear your whole question. I don't think an empirical analysis is necessary. Or I do. If I understand, sorry, I was probably too far back from the mic. I gather from what you said, and you can correct me, is that if we get to the substantial burden analysis, that you think an empirical analysis is required in each case when courts consider it. Am I interpreting your position correctly or not? My position is that I don't think that we need to have studies or historical analysis in the context of a firearm because that doesn't assist us in analyzing what we need to do. Right, but I gather from your, I understood your point on the history, but I thought you were saying, look, if you have empirical evidence of abuse of firearms in a particular locality, that might inform the question of substantial burden or not. And to Judge Callahan's point of what's good in the Yukon may not have the same value here. And to follow up, just so I can give you an opportunity to answer the whole thing, if that's true, what's in the record here about supporting the Sheriff's policy and what do you think ought to be in the record? Well, there's a difference between empirical evidence in the form of studies and evidence that's available because of what's going on in the community. The problem we know with the empirical studies is that they're all over the place. They're not consistent. There's no way to make them consistent. So my sheriff in a border town where we have cartels living in the city of San Diego and acting there, we have gangs, we have drive-by shootings, which are a ritual rite of passage for gangs, which you may not have in Sacramento or Yolo County or somewhere else. That's something that my sheriff takes a look at every day. And when you're on the streets, you do a ride-along in San Diego, you see what's on the streets. You know, we all here, I'm sure, in this room are among the highest order of the human spirit, but that's not the way it is out there in the real world. And that's what each sheriff gets to look at. So empirical evidence... Right, but don't you think that if we get to substantial burdens that the sheriffs would have to articulate the rationale as opposed to just saying this is the way it is. Because otherwise, how are we to, on an appellate level or even on the district court, to assess whether or not the burden is substantial or not in a given context? I think it's because of the nature of the instrument itself. I don't think you have to go much farther. I think if you're talking about other types of weapons, you may be able to go through that type of analysis. But the firearm itself is what's so unique. Except when you're talking about some of the crime that you're talking about, that obviously people don't want to put instruments of death in the community. And on the other hand, if you live in a community like that, if you are a law-abiding citizen, your need to defend yourself could be greater. So, I mean... Sure. And you know, I think we all agree that what we would like to regulate is human misbehavior. But we can't pinpoint that moment where somebody experiences a loss of critical judgment because of passion, anger, intoxication, or mental disorder. So because we can't do that, it's like my children always ask me, why can't I do that, Dad? Because somebody dumb did it at one point, and we had to create a law to stop that. And that's how, why we regulate, is because we can't, there's certain types of behavior we can't control, we can't regulate. And that's what happens when there are loaded weapons out in the street, is that there's a lack of critical judgment or loss of critical judgment because of some individual experience. We can't regulate that. So what we do is we regulate the deadly weapon itself. I can't say that I disagree with you on that point, but I can't say that that helps me on the constitutional adjudication issue. Well... In determining the scope of the Second Amendment. I think those things play into what, you know, what factors... Substantial burden analysis. Sure. Right. I mean, in other substantial burden cases, it's a fairly specific record on what the burden is and balanced against the right. I understand in a general way what you're arguing, but I don't see anything in the record in this case particularly, because probably the issue hasn't come up before, that would... The sheriff says, okay, this is why I'm interpreting, this is my implementation of the statute, and here's why I'm doing it. And articulating the reasons as one might in a legislative statement of purpose for doing so. I mean, we don't have that in this case. And maybe our argument is it's not necessary. But... And the sheriff makes an individual determination on each application as to whether there is a special need. And the goal is not to deny the application, but to grant it when self-defense is necessary. And there are also additional exceptions built into the statute. If there's a restraining order against you, you have a right to carry. You have a right to carry. California actually recognizes carry outside your home because we allow you to carry a loaded weapon in your business, which is, I would argue, appellants, that's akin to outside the home. And California recognizes that. You can take it to your campsite. You can have it in your RV loaded up in order to defend yourself. So there are lots of exceptions built into the California law, along with getting a license to carry. Thank you, counsel. Your time has expired. Mr. Clement, you have some reserve time. Thank you, Your Honor. Just a few quick points in rebuttal. First of all, the position of the appellees seems to be that somehow we had a burden to challenge the California statutes. But I don't see why that's the case. Our beef is not with the California statutes. It's with the county's policy, which they have an opportunity to interpret the statute like Sacramento County in a way that avoids constitutional difficulty. They've decided they don't want to do that, but as they emphasize, they have the discretion one way or another, and that's where our problem is. And that's why we haven't challenged the statute. That's why, with all due respect, 28 U.S.C. 2403B is not even applicable because we're not making a constitutional challenge to a state statute. We are making a challenge to a county policy, and we are arguing that they have a choice. They can zig or they can zag, but ultimately they don't have a choice because if they do what they're doing and not what Sacramento did, they are creating a constitutional problem. We're trying to alleviate that constitutional problem. Analytically, I think it would be the same as if the state had a ban on pamphlets and a local ordinance ban door-to-door solicitation. If the doctrine was you can have one and not the other, I think we'd be free to challenge the local ordinance and say we don't really have a complaint with the state statute. We'll take that as a given. I think that's the nature of the challenge here. Counsel, Mr. Chapin suggests that the presumption is to grant the application for a concealed carry permit. What's your response to that? Well, it's just not the case. It's their policy, which I don't think there's any debate about what their policy is. It's not enough for my clients to go in and say I'd like a permit and my good cause is that I have a need for self-defense. What they require us to show is that we have an extraordinary need for self-defense. And that's the nub of the problem because Heller makes clear that all of us, subject to some kind of disability or something, but all of us have a right to keep and bear arms for purposes of self-defense. We don't need a particularly good reason because all of us have the same basic right. I don't need a particularly good reason to exercise my First Amendment rights. I don't have to have something particularly good to say. In the same way, I have a right to exercise my right to keep and bear arms for purposes of self-defense. Let me say two other things. One is the appellees emphasize that, you know, this is different because these are deadly weapons. You know, the framers knew that. I mean, these weapons had been essentially the same since the time of the framing. He also says, you know, this is something we have to defer to local authorities because this is a question of what kind of society are we going to have. But when you look to what kind of society we're going to have, the place you look, first and foremost, is the Constitution of the United States. And as Justice Scalia said for the court in Heller, the framers themselves have decided this question. They've taken some things off of the table for local authorities. And one thing they've taken off the table is the idea that you can completely make it impossible to exercise the core right. And if you ask what the core right is, it is for purposes of self-defense. But where you look for the core of the right is where you always give the text. And the text is the right to keep and bear arms. And the court has made crystal clear that bear means carry for purposes of self-defense. With all due respect, you would not be extending Heller outside the home. Heller and its constitutional analysis already applies there. The last thing I would say is something odd is going on here. The Supreme Court issued two watershed opinions, Heller and McDonald. Not only has nothing changed, but California has taken this as an invitation to pass Act 144 to make it less easy to have access to a handgun. I think this Court really does have to send the message that those Supreme Court decisions cannot be resisted. They have to simply be applied. Thank you, Your Honor. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Thomas, Callahan